IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

QUENTIN APKARIAN,

        Plaintiff,

v.

OFFICER MCALLISTER, ED WALL, MS. KRUEGER,
DOUG CURTIS, JAMES SCHMIDT,
DUSTIN MEUNIER, JOHN OURADA,
BRUCE SUNDE, PAUL WESTERHAUS,
JOHN DOE OFFICERS #3 and #5,
and JEFF JAEGER,

        Defendants.

ORDER

17-cv-309-jdp

---

Plaintiff Quentin Apkarian, appearing pro se, alleges that while he was housed at Lincoln Hills School, state officials violated his constitutional rights by physically and sexually abusing him when they responded to a fight and failing to provide him with follow-up medical care, and that that state and county officials failed to take action to stop the pattern of abuse at the facility.

The state defendants filed a motion for summary judgment on the ground that Apkarian did not exhaust his administrative remedies at the Lincoln Hills School regarding his claims. Dkt. 54. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").[1] The parties' briefing revealed a dispute of material fact: defendants say that

---

[1] As I have previously stated, the Prison Litigation Reform Act defines "prisoner" as including persons adjudicated delinquent, so the exhaustion requirement applies to Apkarian. Dkt. 60, at 1 n.1.

Apkarian never filed a grievance about the September 2014 incident supporting Apkarian's claims. Apkarian said that he reached out to staff, wrote "multiple" grievances about the events, and contacted defendants Ourada and Westerhaus to report the abuse after he didn't hear back about his grievances.

On January 22, 2019, I held a factfinding hearing under *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008), to resolve the factual dispute. Apkarian testified on his own behalf. Apkarian also called Lamar Smalls, who was at Lincoln Hills during the September 2014 incident and was Apkarian's cellmate for periods before and after the incident.

Apkarian says that in the immediate aftermath of the incident, he was placed in segregation and was not allowed grievance forms. After he was released from segregation in late September 2018, he filled out a grievance form and gave it to defendant Doug Curtis, who never gave it back to him. He says that he retaliated against Curtis by filing several "childish" or "unnecessary" grievances in November 2014 about Curtis's behavior. He ultimately filed several grievances about the September 14 incident, perhaps as many as eight, either by handing them to officers or by placing them in a locked grievance box. But he never heard back about any of them. He says that he wrote letters to defendant supervisory officials John Ourada and Paul Westerhaus, but both of them failed to help him. Westerhaus wrote back stating that if Apkarian continued to threaten legal action for false allegations, he would be punished. Ourada pulled Apkarian aside and said the same thing.

Apkarian does not have copies of the grievance he says that he filed or of the letter that he says he received from Westerhaus. But nonetheless, on its face, I found Apkarian's

---

Westerhouse, No. 08-CV-552-SLC, 2009 WL 961132 (W.D. Wis. Apr. 8, 2009) (applying

2

testimony to be credible. His story is plausible and lacked meaningful inconsistencies. Also, given his clear longstanding problems with what he perceived as patterns of abuse at Lincoln Hills, it is reasonable to infer that Apkarian would have complained about his alleged serious mistreatment in September 2014, particularly given that it is undisputed that he complained about more minor incidents.

Apkarian's testimony is at least partially corroborated by Lamar Smalls, whose testimony I also found to be credible. Smalls says that Apkarian had long been concerned about abuse at Lincoln Hills, going so far as to slip Westerhaus a letter about problems at Lincoln Hills shortly before the September 2014 incident, at the at the facility's "summer games." Smalls was not Apkarian's cellmate in the immediate aftermath of the incident, but in December 2014, he saw Apkarian write grievances about the abuse, and Apkarian would ask Smalls how to spell various facility officials' names, which made it clear that he was writing about the incident. He also said that guards would often tear up grievances given directly to them, and supervisors would not respond to grievances placed in the locked box. He says that he saw Ourada threaten Apkarian with punishment for writing false allegations, and that he saw Apkarian write to Westerhaus.

On cross-examination, counsel for defendants tried but failed to show inconsistencies in Apkarian's testimony. Counsel suggested that because the "summer games" letter to Westerhaus predated the September 2014 incident, it could not have served as Apkarian's letter to Westerhaus complaining about the lack of progress on his grievances. That is indisputably true, but Apkarian says that he also sent Westerhaus a letter directly about the September 2014 incident. Counsel says that in supporting his request for the issuance of writs for the appearance of witnesses at the hearing, Apkarian left out that Smalls saw him write to

3

Westerhaus. But Apkarian replied that he did not include everything that each proposed witness knew, which is a perfectly reasonable response. Counsel suggests that Apkarian failed to mention the abuse at his disciplinary hearing regarding the fight that precipitated the events. But Apkarian says that he indeed mentioned the abuse but that it was not recorded in the disciplinary record. Omission of the abuse allegations would not be surprising, because the alleged abuse is irrelevant to the question whether Apkarian should have been disciplined for the fight.

Because exhaustion is an affirmative defense, defendants bear the burden of establishing that Apkarian failed to exhaust his available remedies. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Had I found Apkarian's testimony to be incredible, I would have ended the inquiry there. But Apkarian's and Smalls's testimony hung together and presented a plausible series of events. This leaves defendants with the difficult task of proving a negative: that Apkarian did not file the grievances that he says he did. I conclude that they failed to make that showing.

Defendants attempted to show Apkarian's failure to exhaust by presenting evidence about the Lincoln Hills grievance policy and the facility record of youth grievances. The 2014 grievance log showed two sets of grievances from Apkarian, but no grievance concerning the September 2014 incident. Defendants presented testimony by current Lincoln Hills Superintendent Jason Benzel and current Deputy Superintendent Lori McAllister.

As superintendent, Benzel has access to the historical grievance files at Lincoln Hills. He presented the 2014 grievance log showing no incident-related grievance by Apkarian, and he asserted that the log was a complete list of the grievances filed that year. His testimony is compromised by the fact that he didn't work at Lincoln Hills in 2014, so he cannot really say how grievances were processed at that time. But even assuming that in 2014 things worked

exactly the same way as Benzel describes them working now, the evidence defendants present does not instill confidence that every single grievance made it onto the log.

Benzel says that Lincoln Hills officials followed their policy 7.02 in handling grievances. *See* Dkt. 73-1. That policy says that before filing a grievance, a youth must first discuss the problem with a social worker or youth counselor (what I take to be Lincoln Hills' version of correctional officers). If that attempt at resolution fails, the youth files a formal grievance and submits it in a sealed envelope to a locked mailbox for a complaint mediator. The mediator or supervising youth counselor places the grievances in the superintendent's locked mailbox to be date stamped and numbered. The mediator attempts to informally resolve the issue with the youth, and if that fails, the mediator conducts a formal investigation and issues a decision that can then be appealed.

Or, if the grievance concerns serious matters like retaliation or abuse, the grievance can be made "directly" to the superintendent instead of the mediator. *Id.* at 1. It is unclear what "directly" means here. It could mean that the youth bypasses the mediator's involvement, or it could mean that the youth also bypasses speaking to a social worker or youth counselor before submitting a written grievance.[2] The parties did not explain this provision at the hearing. If the latter option is how the system is supposed to work, that information was not relayed to the youths.

---

[2] In the DOC's adult-prison regulations, an inmate complaining about sexual abuse or harassment does not have to attempt to informally resolve the matter with an alleged wrongdoing staff member, and the inmate may send the grievance directly to the warden. *See* Wis. Admin. Code § 310.08(2).

McAllister explained that youths were not allowed to see policy 7.02. Instead, they were given a summarized version of the policy in their handbooks. *See* Dkt. 73-5, at 10.[3] It is an admittedly difficult task to break down regulatory language into a format understandable to teenagers, many of whom are not up to their grade level in reading, but the handbook version has material gaps in information that suggests that youths did not know precisely how the grievance system was supposed to work. The handbook version says that before filing a grievance, the youth "must talk to a staff member about it to try to solve it." *Id.* It does not mention sending a grievance directly to the superintendent.

Neither the policy nor the handbook explains how a youth accomplishes this initial step when the youth is making a complaint directly about a staff member. Apkarian clearly thought this meant that he had to first go to the staff member accused of misconduct. He brought his November 2014 grievances about defendant Curtis directly to Curtis—even though he included an allegation that Curtis would rip up his grievances. *See* Dkt. 73-2, at 2. The grievance form itself appears to require participation by the complained-against staff member: it includes a section for the staff member to "describe agreement if complaint resolved or state why problem not resolved." *Id.*

That's how Apkarian's four November 2014 grievances against Curtis proceeded. For each grievance about Curtis's alleged behavior, Curtis filled out the staff-member section, providing either his version of the events at issue or explaining why he thought he did not violate Apkarian's rights. Apkarian dated two of those grievances November 24 and two

---

[3] The handbook says that youths may refer to Wisconsin Administrative Code Chapter DOC 380 ("Complaint Procedure for Youth in Type 1 Secured Correctional Facilities"). Section DOC 380.04(1) says that the institution must give a copy of chapter 380 to a youth as part of the orientation process, but there was no testimony that this procedure was actually followed.

November 27. Each of Curtis's responses is dated November 28, which suggests that Curtis, the alleged violator of Apkarian's rights, had two of those documents in his possession for four days before returning them.[4]

This introduces a major flaw in the grievance process: although the rules themselves are somewhat vague about precisely who should be involved in the first step of the process, the practice at the facility appeared to be that the youth gave the grievance to the staff member alleged of wrongdoing *before* it could be logged by the superintendent's office. This is an extremely suspect way to maintain chain of custody over a grievance. Moreover, nothing in the procedures given to youths explained what should happen if they did not hear back from the staff member accused of wrongdoing.

The risk of tampering is clear, particularly in a case in which a youth alleges extremely serious misconduct, like Apkarian does in this lawsuit—he states that he was beaten, sexually assaulted and humiliated, and then denied medical care. His allegations directly against Curtis are that Curtis was part of a team of officers who beat him after they arrived to break up a fight. One can see how an officer accused of that type of misconduct might be tempted to destroy a grievance. That is exactly what Apkarian and Smalls said often happened at Lincoln Hills.

If a grievance makes it into the locked mailbox, either because the youth and staff member do not come to an informal resolution, or because a youth places it directly into the mailbox, as Apkarian said he did with some of his later alleged grievances about the incident, there is another flaw with the system. Although defendants' witnesses did not specifically

---

[4] Only one of those grievances is stamped "received" by the superintendent's office, but it appears that all four grievances were submitted together as one packet.

discuss this part of the process at the hearing, policy 7.02 states that mediators and "supervising youth counselors" retrieve the grievances from the mailbox and place them in the superintendent's locked mailbox. Dkt. 73-1, at 2. Then either the mediator or superintendent's secretary date-stamps it and gives it a case number.[5]

Apkarian and Smalls said that one of the defendants in this case, Dustin Meunier, had access to the mediator box. There appeared to be a dispute about this fact at the hearing, but I will resolve it in Apkarian's favor. Benzel testified that none of the defendants were supervisors who had access to the mediator box. Both Apkarian and Smalls says that Meunier was a supervisor, and the grievance log shows Meunier as a mediator for three grievances, Dkt. 73-4, at 2. On cross-examination, Benzel admitted that when he said that none of the defendants were supervisors, he meant this was so only "to his knowledge."

In this lawsuit, Apkarian alleges that Meunier and two other officers beat him and then sexually assaulted and humiliated him during a strip search. And Smalls testified that Meunier threatened both him and Apkarian about filing what Meunier called false grievances. So the mediator-box stage is a second point in the grievance process where a staff member accused of wrongdoing could have access to grievances.

Based on the evidence before me, the parties describe a system where a grievance goes through the hands of the youth, the alleged wrongdoer, the youth again, and then potentially a second accused wrongdoer *before* the grievance is stamped received by the superintendent's office. This system raises serious concerns about the chain of custody suggesting that the facility's grievance log did not truly register every grievance that a youth attempted to file.

---

[5] The policy does not say that the official then logs the grievance, so it is unclear exactly when a grievance is entered on the log.

Between the chain-of-custody concerns and Apkarian's and Smalls's credible testimony, I conclude that defendants have failed to meet their burden of showing that Apkarian did not exhaust his administrative remedies. So I will deny their motion for summary judgment. The case will proceed under the schedule set at the preliminary pretrial conference.

Apkarian has filed a motion asking for a transcript of the *Pavey* hearing to be prepared at defendants' expense. Dkt. 74. But there is no mechanism for me to grant that request, nor does Apkarian show any need for the transcript. Like any litigant, Apkarian can choose whether to pay for preparation of the transcript himself. The court does have the power to order preparation of transcripts at the United States government's expense *on appeal*, but we are not yet at the appellate stage. And in any event, my ruling here is in Apkarian's favor, so there does not seem to be a good reason for him to seek preparation of the transcript. I will deny Apkarian's motion.

ORDER

IT IS ORDERED that:

1. The state defendants' motion for summary judgment based on plaintiff Quentin Apkarian's failure to exhaust his administrative remedies, Dkt. 54, is DENIED.

2. Plaintiff's motion for preparation of the *Pavey* hearing transcript, Dkt. 74, is DENIED.

Entered January 28, 2019.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge