IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

QUENTIN APKARIAN,

      Plaintiff,

v.

OFFICER MCALLISTER, ED WALL, MS. KRUEGER,  OPINION and ORDER
DOUG CURTIS, JAMES SCHMIDT,
DUSTIN MEUNIER, JOHN OURADA,       17-cv-309-jdp
BRUCE SUNDE, PAUL WESTERHAUS,
JOHN DOE OFFICERS #3 and #5,
and JEFF JAEGER,

      Defendants.

---

Plaintiff Quentin Apkarian, appearing pro se, alleges that while he was housed at Lincoln Hills School, state officials violated his constitutional rights by physically and sexually abusing him when they responded to a fight and failing to provide him with follow-up medical care, and that state and county officials failed to take action to stop a pattern of abuse at the facility.

Both the state defendants and defendant Lincoln County Sheriff Jeff Jaeger have filed motions for summary judgment. Dkt. 100 and Dkt. 105. Both sets of defendants move for summary judgment on the substance of Apkarian's claims, and the state defendants also contend that certain claims should be dismissed because Apkarian has failed to properly identify some of the defendants. I will grant the state defendants' motion in part and Sheriff Jaeger's motion in its entirety. But there are genuine disputes of material fact over whether state officials physically and sexually abused Apkarian and failed to provide him medical care, so I will deny the state defendants' motion in part and the case will proceed to trial on those

claims. Because there are problems with the identification of several defendants, I will strike the remaining schedule to give the parties more time to identify those defendants.

UNDISPUTED FACTS

In September 2014, plaintiff Quentin Apkarian was a juvenile detainee at Lincoln Hills School, in Irma, Wisconsin. On September 10, Apkarian was housed in Dubois Cottage at the facility. That day, Apkarian was in a physical altercation with his roommate. After the altercation, Apkarian got on the ground and put his hands behind his back.

Apkarian says that the following events then occurred: defendant officers James Schmidt and Doug Curtis beat him "viciously." Dkt. 109, at 1–2, ¶ 4. Then, as Apkarian was being transported to Krueger Cottage, a more secure housing unit, defendant Officer McAllister entered the transport van and assaulted Apkarian by punching, elbowing, and choking him and by throwing him on the ground and against the van. In the course of transporting Apkarian to segregation, defendant Dustin Meunier punched him, slammed his face against the wall, and choked him to the point that he thought he was going to pass out. Then Meunier and John Doe No. 3[1] physically and sexually assaulted Apkarian by "battering" him, touching his testicles and buttocks in a sexual way, and making jokes about his penis. Defendant Schmidt says that he has never witnessed or participated in a beating or a strip search like Apkarian described in his complaint.

---

[1] Apkarian was able to identify three of the five "John Doe" officers against whom he brought claims. I have retained the original numbering of the Doe defendants to be consistent with my previous orders.

2

After these assaults, Apkarian says that he made complaints requesting to be seen by health unit staff, but no one helped him. Apkarian says that defendant Ms. Krueger, the unit manager, told him that she did not think health staff needed to see him because he had only minor injuries. Defendants produce a medical rounds log, Dkt. 89-7, at 1, stating that Apkarian was seen by medical staff on September 12 and 19, 2014, that Apkarian was responsive, had no complaints, had no signs of injury or illness, and presented no mental health concerns. Apkarian met with medical staff on September 30, and he did not seek medical care for injuries from the alleged abuse. Apkarian says that this is because his injuries had "visibly healed," he had already started complaining about the abuse through other channels, and he did not think that medical staff would help because they had already ignored the problem.

Apkarian says that he attempted to report the abuse, but that defendant John Ourada, the Lincoln Hills superintendent, threatened Apkarian with harsh punishments if he continued to report abuse at the facility. About a year after the alleged abuse, defendants Ourada and DOC Director of Juvenile Corrections Paul Westerhaus received a letter from Apkarian about his abuse, which they forwarded to other DOC employees, who in turn sent the letter to the Lincoln County Sheriff's Office. Over the course of the next two years, a detective interviewed Apkarian, other inmates who also complained about staff abuse, and several Lincoln Hills staff members, including defendants Schmidt and McAllister. The detective sent investigatory materials to the district attorney, stating that he did not believe that there was enough evidence to charge staff with a crime.

ANALYSIS

Apkarian brings the following claims:

- Defendant officers Doug Curtis, James Schmidt, McAllister, Meunier and John Doe officer Nos. 3 and 5 beat Apkarian following an altercation between him and another inmate.

- Meunier and Doe No. 5 "verbally and physically humiliated" him during a strip search.

- He did not receive medical care following these events, at least in part because defendant Ms. Krueger, the segregation unit manager, stated that she did not want medical staff involved.

- Supervisory officials, including defendants Superintendent John Ourada, Security Director Bruce Sunde, DOC Director of Juvenile Corrections Paul Westerhaus, and DOC Secretary Ed Wall, were all aware of numerous physical and sexual assaults occurring at Lincoln Hills, but they did nothing to address the safety concerns.

- Defendant Lincoln County Sheriff Jeff Jaeger was also aware of the abuse at Lincoln Hills, but he did not investigate those incidents or refer facility staff to the district attorney to be charged.

Two sets of defendants—the state defendants and Sheriff Jaeger—have each filed a motion for summary judgment. To succeed on a motion for summary judgment, defendants must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment should be granted to the moving party. *Celotex*, 477 U.S. at 322.

4

## A. Proper legal standard

In screening Apkarian's excessive force, strip search, medical care, and failure-to-protect claims against Lincoln Hills staff, I noted that the law is unsettled regarding the appropriate constitutional standard to apply to claims brought by juvenile detainees. If Apkarian had been a convicted prisoner at the time of the events of this case, Eighth Amendment standards would govern these claims. Under the Eighth Amendment, plaintiffs are protected against cruel and unusual punishment. To win on an Eighth Amendment claim, a plaintiff generally needs to show that the defendant intentionally harmed him or consciously disregarded a risk of harm to him.

But in Wisconsin, an adjudication of juvenile delinquency "is not a conviction of a crime." *See* Wis. Stat. § 938.35(1). Claims by prisoners who are not convicted—such as pretrial detainees or civilly committed sex offenders under Wis. Stat. Ch. 980—are ordinarily governed by the Fourteenth Amendment, under which plaintiffs need not prove the defendant's subjective state of mind; they need show only that the defendant's actions were "objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (discussing an excessive force claim); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (expanding *Kingsley's* rationale to medical care claims). Rather than the Eighth Amendment's prohibition on cruel and unusual punishment, the Fourteenth Amendment prohibits any type of punishment. *See Youngberg v. Romeo*, 457 U.S. 307, 320 (1982); *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law"). I asked the parties to provide briefing on the appropriate legal standards for Apkarian's claims here. Dkt. 21, at 4–5.

Apkarian does not discuss the issue other than to apply Eighth Amendment standards to his claims. But Apkarian is a pro se prisoner who has no legal education, so his invocation of Eighth Amendment standards doesn't settle the matter. Case law on the question is mixed.

The Court of Appeals for the Seventh Circuit long ago applied the Eighth Amendment in a case about the use of corporal punishment and tranquilizing drugs at a juvenile institution. *See Nelson v. Heyne*, 491 F.2d 352, 354–57 (7th Cir. 1974). But much more recently, the court of appeals has stated that the correct standard to apply to juvenile cases remains unclear, noting specially that the United States Supreme Court has avoided answering the question. *See Reed v. Palmer*, 906 F.3d 540, 549 (7th Cir. 2018). Some courts have applied the Eighth Amendment and others the Fourteenth. *See Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 259 (3d Cir. 2010); *Tribble v. Arkansas Dep't of Human Servs.*, 77 F.3d 268, 270 (8th Cir. 1996); *Morales v. Turman*, 562 F.2d 993, 998 n.1 (5th Cir. 1977) (all applying the Eighth Amendment); *but see Milonas v. Williams*, 691 F.2d 931, 942 (10th Cir. 1982); *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987); *J.S.X. Through D.S.X. v. Foxhoven*, 361 F. Supp. 3d 822, 832 (S.D. Iowa 2019) (all applying the Fourteenth Amendment).

The state defendants contend that the Eighth Amendment makes more sense as a standard because Apkarian, like a convicted prisoner, is a "posttrial detainee." I take them to be arguing that—unlike other non-convicted detainees—he has received trial process and the state is free to punish juvenile delinquents, making a delinquency more similar to a criminal case than to pretrial detention or Chapter 980 proceedings. To support this, they note that the Wisconsin Legislature has identified "hold[ing] each juvenile offender directly accountable for his or her acts" as a purpose of the state's Juvenile Justice Code, which they say means that punishment is one purpose of juvenile-delinquency detentions. Wis. Stat. § 938.01(2)(b).

6

This argument doesn't square with the Wisconsin Supreme Court's own analysis of the Juvenile Justice Code. In *In re Hezzie R.*, 219 Wis. 2d 848, 580 N.W.2d 660 (1998), three juveniles challenged amendments to the juvenile code that removed their right to a jury trial. The court concluded that provisions subjecting a juvenile to adult prison were unconstitutional because "they essentially subject a juvenile to the consequences of a 'criminal prosecution' without the right to a trial by jury." *Id.* ¶ 55. The court upheld the bulk of the code—including the provision allowing placement in a juvenile institution—despite the removal of jury trials. The court explicitly stated that "[p]lacement in a juvenile facility *is not criminal punishment* and does not convert the [juvenile justice code] into a criminal code." *Id.* ¶ 50 (emphasis added). The court stated that even with the elimination of jury trials, the "rehabilitation of juveniles is a primary objective" of the code. *Id.* ¶ 33.

A juvenile delinquency adjudication, in Wisconsin as elsewhere, is not a criminal conviction and the accused juvenile's trial does not come with the same procedural safeguards as in a criminal proceeding. "The State has a *parens patriae* interest in preserving and promoting the welfare of the child, which makes a juvenile proceeding fundamentally different from an adult criminal trial." *Schall v. Martin*, 467 U.S. 253, 263 (1984) (internal quotation and citation omitted). This suggests that delinquencies are more akin to other types of detention where the primary objective is something other than punishment, like civil commitments of sexually violent persons or pretrial detentions. Those are situations in which the Fourteenth Amendment applies. *See J.S.X. Through D.S.X.*, 361 F. Supp. 3d at 832 ("Given the expressly non-penal, non-criminal nature of Iowa juvenile delinquency adjudications and dispositions, the Court finds Plaintiffs' Eighth and Fourteenth Amendment claims more appropriately arise under the Fourteenth Amendment only.").

The state defendants are correct that a juvenile adjudicated delinquent is a "posttrial detainee." But so is someone civilly committed under Wis. Stat. Chapter 980. And yet, Wisconsin still affords the respondent in those proceedings the right to a jury trial, unlike a juvenile facing a delinquency adjudication. Wis. Stat. § 980.03(3). That the juvenile has received some amount of process before imprisonment is not decisive. Ultimately, because juvenile adjudications are not criminal in nature, I conclude that the proper standard to apply to Apkarian's claims against Lincoln Hills staff is the Fourteenth Amendment.

## B. Apkarian's claims

The summary judgment analysis for Apkarian's claims about directly about the alleged assaults and lack of medical care is relatively simple. Apkarian says that defendants beat him, sexually humiliated him, and failed to provide him with medical care. Defendants say that they did none of these things. But they provide very little direct evidence rebutting Apkarian's version of events.

It's commonplace in these types of cases for each of the defendants to provide a declaration explaining their version of the disputed events. The only state defendant submitting a declaration is defendant Schmidt, who says that he's never seen nor taken part in beatings or strip searches of the kind described by Apkarian. That's enough to rebut Apkarian's version of the initial beating in which he says that Schmidt was present. But Schmidt wasn't present for the transport to Krueger Cottage or the strip search, so he cannot rebut Apkarian's version of those events. And even so, all Schmidt's testimony accomplishes is to create a dispute of material fact about the incidents that he says he witnessed.

Otherwise, the state defendants attempt to rebut those events by citing the medical and psychological rounds log showing that Apkarian was visited by staff two days and nine after

8

the incidents. For both days, the record shows that Apkarian was responsive, had no complaints, had no signs of injury or illness, and presented no mental health concerns. Dkt. 89-7, at 1. Armed with this record, defendants say that the events could not have occurred the way Apkarian says they did because he showed no visible injuries, even though he alleges that he was visibly bruised and bloodied.

Apkarian disputes this, saying no one visited him on these days. The state defendants contend there is not a dispute over the authenticity of the round log because Apkarian submitted a copy of it as well, calling it "true and correct." Dkt. 110, at 3 ¶ 3. But Apkarian is very clear throughout his summary judgment materials that he thinks that the record is incorrect and perhaps fabricated. Apkarian followed defendants' reply by submitting a letter stating that by "true and correct" he meant that he received the document from defendants and he did not alter it in any way. Dkt. 123. This court disfavors sur-replies, but this one merely confirms what any reasonable reviewer would have concluded given Apkarian's version of events: Apkarian meant that the document is a true copy of the DOC's document, not that the substance of the record is true. So Apkarian has sufficiently disputed the round log.

Defendants also note that it is undisputed that Apkarian appeared at his disciplinary hearing two days after the incidents, and the record of that hearing "do[es] not include a single suggestion that he was injured at the time he appeared." Dkt. 87, at 15. But they do not explain why the form recapping the disciplinary proceeding, Dkt. 89-4, would include details about Apkarian's injuries. This court keeps minutes of its proceedings too, but those documents do not describe the physical appearance of the people appearing before it. The hearing record's extremely cursory recap of the evidence presented gives me no reason to believe that Apkarian's physical appearance was a matter in issue, so the hearing record's silence doesn't raise an

9

inference either way about the existence of Apkarian's injuries. Of course, even if the record said that Apkarian looked uninjured, Apkarian's own testimony would be enough to place that issue in dispute.

Defendants contend that the details of Apkarian's story have changed between his original and amended complaints, and that the allegations in his complaints are too vague to support claims. But I've already ruled that Apkarian stated claims for relief against defendants; it's too late for defendants to ask for reconsideration of that ruling now. Whether Apkarian's story has shifted is a matter of credibility to be taken up on cross-examination at trial. At the summary judgment stage, I have to resolve factual disputes in Apkarian's favor. And his declaration testimony of the alleged beatings, sexual humiliation, and lack of medical care is enough for a jury to conclude that defendants' conduct regarding each of these claims was objectively unreasonable.

That leaves Apkarian's claims that DOC supervisory officials didn't do anything to address safety at Lincoln Hills, and that Lincoln County Sheriff Jaeger discriminated against him by not investigating his allegations. With one exception, Apkarian fails to provide any evidence that shows that these officials violated his rights.

In screening Apkarian's claims against DOC supervisory officials Ourada, Sunde, Westerhaus, and Wall, I told him that to prove his claims he would need to provide evidence showing that these officials were truly aware of a pattern of abuse and that they failed to take action to protect the Lincoln Hills detainees. Defendants say that when Apkarian finally gave Ourada and Westerhaus a letter about a year after the incidents, they forwarded it on to DOC officials who forwarded it to the sheriff. Apkarian does not dispute this proposed fact or

10

otherwise present evidence showing officials' disregard for his safety. So I will grant the state defendants' motion for summary judgment on all of these supervisory-official claims but one.

The exception is that Apkarian says that at some point, he attempted to report the abuse, but that defendant John Ourada, the Lincoln Hills superintendent, threatened him with "harsh punishments" if he continued to report abuse at the facility. He presents a declaration from fellow inmate Lamar Smalls, who says that he heard Ourada threaten Apkarian "to stop reporting assaults or he would be crucially punished." Dkt. 111, at 2. Neither Apkarian nor Smalls explain exactly when this incident took place, but I take them to be saying that it predated Apkarian's September 2015 letter that Ourada passed on to other DOC officials. So regardless of what appropriate step Ourada took in September 2015, Apkarian says that Ourada acted unreasonably toward a safety complaint before then, despite knowing about how Apkarian had already been harmed. So I will deny defendants' motion for summary judgment on a failure-to-protect claim against Ourada.

As for the equal protection claim against Sheriff Jaeger, "class-of-one" equal protection claims under the Fourteenth Amendment "can be brought based on allegations of the irrational or malicious application of law enforcement powers." *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012); *see also Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000) ("If the police decided to withdraw all protection from Hilton out of sheer malice, or because they had been bribed by his neighbors, he would state [an equal protection] claim."). But Apkarian provides no evidence showing that the sheriff's office discriminated against him or even that Jaeger was personally involved in any decisions about the investigation of his incident. Jaeger presents evidence showing that Apkarian's incident was part of a broader investigation by the office regarding alleged abuse by Lincoln Hills staff, albeit one that did not

result in charges. Because Apkarian does not present any evidence that could support an equal protection claim against Jaeger, I will grant Jaeger's motion for summary judgment and dismiss him from the case.

C. **Qualified immunity**

Defendants also say that they are entitled to summary judgment under the doctrine of qualified immunity. "[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Put a bit more bluntly, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The doctrine translates into a two-part test: (1) whether the public official violated the plaintiff's constitutional rights; and (2) whether those rights were clearly established at the time of the alleged violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A right is "clearly established" when a reasonable official would know that his "conduct was unlawful in the situation he confronted." *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 915 (7th Cir. 2011) (citations omitted).

I've already concluded that there are factual disputes on the excessive force, strip search, medical care, and failure-to-protect claims. The state defendants contend that Apkarian's rights concerning these claims are not clearly established, in part because of the lack of clarity in which constitutional amendment applies to juvenile detainees, and in part because they call Apkarian's allegations vague and including no proof of injuries. Apkarian initially did not respond to the qualified immunity argument. He later filed a proposed supplement, Dkt. 124,

which does not address specific case law. I conclude that he doesn't have to, given the severity of his allegations.

Defendants do not cite any authority for the proposition that claims regarding juveniles are doomed because the precise constitutional standard has not yet been articulated by the Supreme Court. But the Court of Appeals for the Seventh Circuit rejected a similar argument in *Kingsley*, stating that qualified immunity was not available to defendants upon remand from the Supreme Court decision clarifying the standard to be applied in pretrial-detainee excessive force cases. *Kingsley v. Hendrickson*, 801 F.3d 828, 833 (7th Cir. 2015) ("To accept the defense of qualified immunity here, we would have to accept the dubious proposition that, at the time the officers acted, they were on notice only that they could not have a reckless or malicious intent and that, as long as they acted without such an intent, they could apply any degree of force they chose. As we have noted, however, the law clearly established that the amount of force had to be reasonable in light of the legitimate objectives of the institution.").

Regardless of the exact legal standard to apply to Apkarian's claims here, it has long been clearly established that state prison or detention-facility staff cannot beat a prisoner or conduct a sexually humiliating strip search for no legitimate penological reason. I've already dismissed defendants' objection to the vagueness of Apkarian's allegations and the argument fares no better regarding qualified immunity. Apkarian's version of events describes defendants' conduct as so egregious that there is no question it violated his clearly established rights. So I conclude that defendants are not entitled to qualified immunity. Accordingly, I will deny the state defendants' motion for summary judgment on all of Apkarian's excessive force, strip search, and medical care claims, and his failure-to-protect claim against defendant Ourada.

D. Parties

Although it's clear which claims survive summary judgment, there are still some lingering problems with identifying some of the defendants.

Apkarian named several defendants as "John Does" and was able to identify some of them by providing physical descriptions of them in his amended complaint. *See* Dkt. 39. But he does not remember any identifying characteristics of Doe No. 3 and he did not follow up with further attempts to identify Doe No. 5 after defendants said that they could not identify the person.

Apkarian also named "Ms. Krueger," the Krueger Cottage unit manager, as the defendant on his medical care claim. Defendant accepted service on behalf of this defendant. But now at summary judgment they say that the claim should be dismissed because no one by that name worked in Krueger Cottage in September 2014. The court appreciates the state defendant working with Apkarian on his discovery requests to identify the Doe defendants. But because they did not raise the Krueger identity problem before summary judgment, they've given Apkarian little chance to fix the problem. In response, Apkarian says that he has learned that this defendant was actually the Dubois Cottage manager during the time in question. My review of the employee work schedules provided by defendants does not show a Ms. Krueger working in the Dubois Cottage either. But it does show that there was an employee named Krueger working on the Roosevelt Cottage on September 10 and some of the following days. *See, e.g.*, Dkt. 89-5, at 10, 11, 16. Neither party addresses this information.

My review of the employee log raises another potential defendant-identity problem. The state defendants contend that they should be granted summary judgment on Apkarian's claim against defendant McAllister because McAllister did not work in either the Dubois or

Krueger cottages during the time in question. Apkarian says that he did not make that assertion: his allegation is that McAllister was present during his transport. In any event, the log shows more than one McAllister working at Lincoln Hills on September 10, 2014: a D. McAllister and a R. McAllister. *Id.* at 10. I can't tell from the parties' filings whether they agree on who the correct McAllister is.

Apkarian could have been more diligent in pursuing further discovery to identify the Doe defendants, but crafting effective discovery for this type of this issue is a difficult task for a pro se litigant. Apkarian points out that a schedule listing names of employees has limited utility, given that he cannot necessarily place names to each individual involved. And defendants are in part responsible for the problems with defendants Krueger and McAllister. I conclude that the most equitable solution is to strike the remaining schedule and conduct at least one more round of discovery in attempt to identify Does No. 3 and 5, Krueger, and McAllister.

Defendants say that they submitted their "best good faith response" regarding the Does after receiving Apkarian's physical descriptions. Dkt. 47, at 6. But other than the Lincoln Hills employee schedule, defendants do not explain precisely what documents they referred to in an effort to identify the officers taking part in the events following Apkarian's altercation with another juvenile. I will give defendants a short time to explain whether there are any other documents, such as an incident report, transportation log, or strip-search log, that would identify the officers involved in those events, and to provide those documents to Apkarian and the court. Alternatively, they can provide Apkarian and the court with photographs of each male officer who could have reasonably have taken part in the response to the altercation, the transport, or the strip search. Because Apkarian also identified Doe No. 5 as transporting him

15

to the hospital in 2013 for surgery on his finger, defendants should explain whether there are any records of that transport that would identify the Doe.

To identify defendants Ms. Krueger and Officer McAllister, I will have Apkarian respond first; he should provide defendants and the court with physical descriptions of these defendants, as he did for the Doe defendants. Or perhaps Apkarian already knows which McAllister he means to sue; if so, he should explain that. Defendants should respond to Apkarian's filing by either naming those defendants, or if they cannot, by explaining who worked as the segregation cottage manager and Dubois Cottage manager during the times in question (the employee logs do not appear to show which of the listed employees, if any, worked as unit managers). Defendants should also explain why the staff member named Krueger is not the correct defendant for this claim. If Apkarian cannot then identify Ms. Krueger, I will expect them to submit photographs of all of the female staff members who could possibly have met with him during the time in question to discuss his injuries.

ORDER

IT IS ORDERED that:

1. Defendant Jeff Jaeger's motion for summary judgment, Dkt. 100, is GRANTED.

2. The state defendants' motion for summary judgment, Dkt. 105, is GRANTED IN PART as discussed in the opinion above.

3. Defendants Sunde, Westerhaus, Wall, and Jaeger are DISMISSED from the case.

4. The remaining schedule, including trial date, is STRUCK.

5. Apkarian and the remaining defendants may have until September 30, 2019, to respond regarding the defendant-identification issues discussed above.

Entered September 9, 2019.

BY THE COURT:
/s/

_____
JAMES D. PETERSON
District Judge